CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1262

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JI CHAOQUN,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-CR-611 — **Ronald A. Guzmán**, *Judge*.

ARGUED APRIL 3, 2024 — DECIDED JULY 10, 2024

Before ST. EVE, KIRSCH, and LEE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. This case asks us to answer questions about the meaning of an espionage statute more than a century old. The statute, 18 U.S.C. § 951, imposes penalties upon anyone acting within the United States as an agent of a foreign government without first registering as such with the Attorney General—that is, unless they fall under one of four enumerated exceptions. The relevant one here excludes anyone "engaged in a legal commercial transaction." *Id.* § 951(d)(4).

Following his conviction as an unregistered foreign agent, Ji Chaoqun argues that the government must negate the legal commercial transaction exception as an element of the offense—lifting his burden to prove the exception as an affirmative defense. He also urges us to decide that the specific action a defendant takes on U.S. soil for a foreign principal is an element of the offense and therefore requires jury unanimity.

We disagree and hold that a jury need not unanimously decide which act a foreign agent committed when charged with violating § 951. Similarly, we find that the legal commercial transaction exception is an affirmative defense. Accordingly, Ji's legal challenges to his § 951 conviction fail. So do the various other challenges he raises to the district court's evidentiary and sentencing decisions.

**I. Background**

Ji Chaoqun is a Chinese national who came to the United States in 2013 to study electrical engineering at the Illinois Institute of Technology in Chicago, Illinois. In May 2022, a grand jury returned a superseding indictment against Ji, charging him with conspiring to commit an offense against or defraud the United States in violation of 18 U.S.C. § 371, failing to register as a foreign agent in violation of 18 U.S.C. § 951(a), two counts of wire fraud in violation of 18 U.S.C. § 1343, and making a materially false statement in violation of 18 U.S.C. § 1001(a)(2).

At Ji's trial in September 2022, the government presented evidence that the Chinese Ministry of State Security recruited Ji before he left China for his graduate studies in the United States. The Ministry of State Security, or "MSS," is an arm of the Chinese government engaged in foreign intelligence and

espionage, including stealing foreign technologies. The MSS began courting Ji at a career fair in January 2013 while he was in his last year of university in China. At that career fair, Ji met Zha Rong, an MSS agent looking to recruit for the organization. Zha asked Ji if he was interested in joining a "confidential unit," to which Ji expressed interest. Ji's text messages later that summer show that he first considered joining the MSS's Counterintelligence Investigation Bureau, which investigates foreign spies in China, but eventually he learned that the MSS would "train [him] to do things on their behalf" in the United States. After meeting with another MSS agent, Geng Zhengjun, Ji departed China in August 2013 to begin his graduate studies at the Illinois Institute of Technology. The MSS, through Geng, paid for Ji's flight to the United States.

In December 2013, Ji returned to China where he had multiple meetings with MSS officers. Xu Yanjun, who specialized in stealing aviation-related secrets, met with Ji twice. Meanwhile, Geng took Ji to dinner. The MSS facilitated these meetings by paying for some of Ji's travel within China.

Photos from his trip found on Ji's phone provided additional evidence of Ji's relationship with the MSS. One photo, taken on December 31, showed stacks of $100 bills. He also had a photo of a document titled "Registration Form for Personnel Working Overseas of the Ministry of State Security" with the heading "Top Secret—Long Term." The otherwise blank form was already populated with Ji's name. Ji also had photos of a training manual explaining how to respond to FBI questions. And an additional photo from January 10, 2014, the day of Ji's second meeting with Xu, showed more stacks of $100 bills. Ji texted his father that day telling him he had received $6,000 in U.S. currency.

A few days after his second meeting with Xu and receiving this payment, Ji returned to the United States. He then messaged Yu Wenzhi, a friend from high school studying engineering at George Washington University. Attaching photos of cash and the MSS registration form, Ji explained that he had been given $20,000, which he would share with Yu if Yu befriended engineers in aircraft design and aircraft engines. Ji does not appear to have followed up on this conversation.

Thereafter, Ji met with MSS officers during two more brief trips to China, one in May 2014 and another in December 2014. In July 2015, Xu checked in to see how Ji was doing; Ji lied and said he had an internship that summer at Motorola (he did receive an offer but had turned it down). Then, in August 2015, Xu asked Ji to purchase background reports on eight scientists, most born in China or Taiwan, working in the United States on aviation technologies. Ji purchased reports from three specific credit report companies Xu identified, each time using an email address Ji opened under an alias. He then sent Xu those reports from the same email address in a compressed and encrypted file, with the subject "Midterm test questions." A few weeks later, Xu instructed Ji to do the same thing with a ninth person, which Ji did. In return, Xu paid Ji $1,000.

On October 29, 2015, Ji filled out an application for the FBI's Honors Talent Internship Program but left the citizenship field blank. He took no other steps to obtain employment with the FBI. Instead, Ji enlisted in the U.S. Army Reserves on May 20, 2016 as part of the Military Accessions Vital to the National Interest ("MAVNI") program, which would expedite his application for U.S. citizenship. Although the MSS did not direct him to take this step, Ji informed them he had joined

the U.S. military and told an acquaintance he was "undercover at the Department of Defense" doing "intelligence stuff" in the army. The acquaintance remembered that this was Ji's goal in high school.

Then, in 2018, U.S. authorities arrested Xu in Belgium. Afterwards, Ji met three times with someone he believed to be an MSS agent investigating Xu's arrest and Ji's potential exposure. In reality, that "MSS agent" was an undercover FBI agent. When the agent first approached Ji, Ji expressed some hesitation but ultimately accompanied him to a nearby hotel. At all three meetings, the agent conducted recorded interviews in one of the guest rooms of the hotel. In those meetings, Ji explained he had received cash from MSS officers and signed receipts for the payments. Ji also shared his independent efforts, including how he aimed to get citizenship quickly through the MAVNI program. Once he obtained citizenship, he would look for jobs with top-secret clearance, including positions at the CIA, FBI, and NASA. Ji intimated he would recruit other Chinese nationals in the MAVNI program who might be willing to work for the organization and could use his identification to obtain access to military bases and photograph aircraft carriers.

After hearing this evidence, the jury convicted Ji on all counts. The district court then sentenced Ji to 96 months' imprisonment.

Ji now challenges both his conviction and his sentence, asserting that the district court erred repeatedly before, during, and after trial. Focusing on his conviction as an unregistered foreign agent in violation of § 951, Ji contends that the district court wrongly permitted the government to constructively amend the indictment by presenting trial evidence of actions

he undertook in the United States not listed in the indictment, then compounded that error by not giving the jury a unanimity instruction as to the specific act. He also finds fault with the district court's determination that the "legal commercial transaction" exception to § 951 is an affirmative defense and decision not to allow Ji to present that defense at trial. He further challenges the denial of his motion to suppress incriminating statements and exclusion of expert witness testimony. Finally, Ji concludes his laundry list of complaints by arguing that his sentence was both procedurally and substantively unreasonable. We examine—and reject—each argument in turn.

## II. Section 951 Conviction

The meat of this appeal concerns the meaning of § 951, so we begin with that statute. Relevant to Ji's appeal, § 951 penalizes "[w]hoever, other than a diplomatic or consular officer or attaché, *acts* in the United States as an agent of a foreign government without prior notification to the Attorney General." 18 U.S.C. § 951(a) (emphasis added). The statute defines "agent of a foreign government" to mean "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official," § 951(d), with four enumerated exceptions:

> (1) a duly accredited diplomatic or consular officer of a foreign government, who is so recognized by the Department of State;
>
> (2) any officially and publicly acknowledged and sponsored official or representative of a foreign government;
>
> (3) any officially and publicly acknowledged and sponsored member of the staff of, or employee of, an officer,

official, or representative described in paragraph (1) or (2), who is not a United States citizen; or

(4) any person engaged in a legal commercial transaction.

Ji's arguments related to his § 951 conviction divide into two parts. The first relates to the meaning and centrality of the verb "acts" in § 951(a). Ji says the district court should have instructed the jury that it must unanimously decide which act he took in the United States that put him in violation of the statute. He also argues that the government presented evidence of acts at trial not included in the indictment, and in so doing, constructively amended the indictment.

The second cluster of challenges relates to the § 951(d)(4) exception, which exempts from the meaning of "agent of a foreign government" anyone "engaged in a legal commercial transaction." Ji contends that the *absence* of this exception is an element of the offense, meaning the government had to prove that Ji was *not* engaged in any such legal commercial transaction. In the alternative, Ji asserts that the district court should have permitted him to present the defense to the jury.

**A. Unanimity**

A jury must unanimously agree on each element of a criminal offense in order to convict a defendant. *See Richardson v. United States*, 526 U.S. 813, 817 (1999). The jury need not, however, unanimously decide which "underlying brute facts make up a particular element." *Id*. Elements "are ordinarily listed in the statute that defines the crime." *Id.* Details as to *how* an element might be accomplished, especially if unspecified by the statute's text, are brute facts, or the means to satisfying the element. For example, if a statute includes the use of

a deadly weapon as an element and explains that "the use of a knife, gun, bat, or similar weapon would all qualify," only the use of the deadly weapon is an element. *Mathis v. United States*, 579 U.S. 500, 506 (2016). Because the type of weapon is not an element, jurors need not unanimously decide which weapon the defendant used. *Id*. On the other hand, if those factual variations lead to different charges or different maximum punishments, those variations are elements, not a means to accomplishing an element. *Id.* at 507, 518; *see also United States v. Requena*, 980 F.3d 30, 49 (2d Cir. 2020).

Whether a particular fact is an element of the crime (requiring jury unanimity) or simply an underlying fact proving an element (not requiring unanimity) is a question of statutory interpretation, legal tradition, and potential for unfairness to the defendant. *See United States v. Pollock*, 757 F.3d 582, 587–88 (7th Cir. 2014) (citing *Richardson*, 526 U.S. at 820); *see also United States v. Turner*, 836 F.3d 849, 863 (7th Cir. 2016); *United States v. Verrecchia*, 196 F.3d 294, 299 (1st Cir. 1999). As with all questions of statutory interpretation, we review de novo whether the domestic "act" is an element of the offense. *See United States v. Bloom*, 846 F.3d 243, 255 (7th Cir. 2017).

We begin with the statute's text, which requires anyone who "acts in the United States as an agent of a foreign government" to register with the Attorney General. § 951(a). The statute itself does not define the actions that might satisfy the statute. Nor does it specify a particular quantity or quality of those actions. Indeed, the act need not even be an illegal act.

Because § 951 does not define "acts," we turn to its "ordinary, contemporary, common meaning" in 1948, when the statute's precursor became the modern § 951. *Delaware v. Pennsylvania*, 598 U.S. 115, 129 (2023). The Oxford English

Dictionary (1933), after defining the verb metaphorically—"[t]o perform on the stage of existence"—concisely defines the verb form of "act": "[t]o perform actions, to do things, in the widest sense." Black's Law Dictionary (3d ed. 1933) defines the noun "act" broadly, as "[s]omething done voluntarily by a person." These definitions and the absence of a statutory definition point toward an expansive meaning for the word "act." *See* Antonin Scalia & Bryan A. Garner, Reading Law 101 (2012) ("Without some indication to the contrary, general words … are to be accorded their full and fair scope.").

That capacious meaning suggests that while a jury must find that the defendant took *some* action, it need not agree on the particular act. *See United States v. Ackell*, 907 F.3d 67, 80 (1st Cir. 2018) (finding that the undefined and general term "course of conduct" supports the conclusion that the underlying acts are a means, not an element). In its verb form, "acts" transitions the reader to the focus of the statute: agency relationships without prior notice to the Attorney General. *Cf. United States v. Villegas*, 494 F.3d 513, 514–15 (5th Cir. 2007) (finding that the type of firearm in 18 U.S.C. § 922(g) is not an element of the crime because an extensive list of prohibited persons juxtaposed with the general term "any firearm" indicates statutory concern with the type of person, not the type of firearm). A violation of the statute in no way turns on the nature of the act, resulting in a different crime or steeper punishment. *See United States v. Mannava*, 565 F.3d 412, 416 (7th Cir. 2009) (noting that when "nothing would turn on the disagreement," a verdict is not invalidated due to lack of unanimity). Instead, it turns on whether the action was taken on behalf of a foreign government and without prior notice to the United States.

The Supreme Court's decision in *Richardson* shows why the broad scope of "acts" in § 951 matters. There, the Court concluded that 21 U.S.C. § 848's uses of "violates" and "violations" carried legal significance marking them as separate elements because "[a] 'violation' is not simply an act or conduct; it is an act or conduct that is contrary to law." *Richardson*, 526 U.S. at 818. Here we have the opposite—a generic action without the legal valence the Court found so significant in *Richardson*. That distinction cuts against applying the unanimity requirement to actions in violation of § 951.

Cases interpreting § 951 accord with our holding that the statute does not require jury unanimity as to the act. In *United States v. Latchin*, for example, we held that "[w]hether Latchin actually spied on Iraqi Christians in the United States may be another matter altogether. But the jury did not have to find that he did to convict him under § 951. It is enough for the jury to conclude that Latchin took acts of *some kind* on behalf of Iraq without first registering as a foreign agent." 554 F.3d 709, 715 (7th Cir. 2009);[1] *see also United States v. Duran*, 596 F.3d 1283, 1295 (11th Cir. 2010) ("The limited legislative history persuasively suggests that Congress chose to separate § 951 and treat it as a catch-all statute that would cover *all conduct* taken on behalf of a foreign government.") (emphasis added).

Further, given that it is the act and not its particular character that matters, a lack of jury unanimity as to the act is not likely to prejudice the defendant, since the nature of that

[1] As Ji points out, the district court in *Latchin* gave a unanimity instruction as to the act. But nothing in the Seventh Circuit decision required such an instruction, and we interpret its reasoning above to mean that no unanimity instruction is necessary.

action has no effect on the severity of the charge or the offense level. *See Pollock*, 757 F.3d at 587–88 (explaining that when jury disagreement about the factual basis for an element does not change the seriousness of the offense, no unfairness results). If one juror believed Ji attempted to recruit his childhood friend Yu by offering him cash in exchange for cultivating relationships with aircraft engineers, and another juror believed Ji joined the army as an agent of the MSS in hopes that he might later obtain secret information, both would still be in agreement that he "act[ed] in the United States as an agent of a foreign government without prior notification to the Attorney General." Neither the crime nor the maximum punishment would change.

The "legislative history can never defeat unambiguous statutory text," *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020), but here, although we do not rely on that history for our conclusions, the legislative history of § 951 reinforces the plain text's meaning and an expansive reading of "acts." The statute's precursor was first enacted into law in 1917 as part of the Espionage Act. *United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021); *see also* David Aaron, 18 U.S.C. Section 951 and the Non-Traditional Intelligence Actor Threat from the First World War to the Present Day, 45 Seton Hall Legis. J. 1, 16–17 (2021). The Espionage Act emerged from concerns that Germany was influencing America's choice to enter World War I, including through activity that did not violate any criminal law on the books at that time. Aaron, *supra*, at 9, 15. In its original form, the statute addressed behavior that was not otherwise illegal (including recruitment of a skilled labor force for Germany in the 1930s) and "rendered [that conduct] illegal because" it was performed on behalf of a foreign government. *Id.* at 23. Then, in 1948, the relevant provision of the

Espionage Act became today's 18 U.S.C. § 951 without any substantive changes. *Id.* at 19. This history suggests that any act triggers liability and underscores the statute's target: failure to register as a foreign agent.

In sum, based on the plain statutory text, we conclude that the specific act taken on behalf of a foreign government under § 951 is a means, not an element, and therefore a jury need not unanimously decide which act the defendant performed to find him guilty. The district court did not err by refusing to give a unanimity instruction.

**B. Constructive Amendment**

With this understanding of "acts" in § 951, we turn to Ji's argument that the government improperly amended the indictment by presenting actions to the jury never mentioned in the indictment. We review de novo whether the government constructively amended the indictment. *United States v. Davis*, 845 F.3d 282, 293 (7th Cir. 2016).

"A constructive amendment of an indictment occurs when the evidence at trial goes beyond the parameters of the indictment in that it establishes *offenses* different from or in addition to those charged by the grand jury." *United States v. Shields*, 789 F.3d 733, 742 (7th Cir. 2015) (internal quotations omitted) (emphasis added); *see also United States v. Griffin*, 76 F.4th 724, 736 (7th Cir. 2023). For a switch of this kind to constitute a constructive amendment, "the crime charged in the indictment must be 'materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved.'" *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014) (quoting *United States v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002)).

Evidence presented at trial that is different from that included in the indictment or presented to the grand jury does not constitute a constructive amendment of the indictment when the new evidence does not result in a different offense. *See United States v. Rogers*, 44 F.4th 728, 735–36 (7th Cir. 2022).

Count II of the superseding indictment, which charged Ji with violating § 951(a), incorporates paragraph 1 of Count I, then alleges that between August 28, 2013, and September 25, 2018, Ji "did knowingly act in the United States as an agent of a foreign government." Paragraph 1 of Count I in turn mentions the MAVNI program and background reports available for purchase from certain companies. The indictment does not mention the messages Ji exchanged with Yu or Ji's application to the FBI talent network.

Despite its absence in the indictment, this additional evidence does not constitute a constructive amendment because those acts did not change or add to the charged offense. Ji's argument to the contrary turns on his assertion that the act is an element of the offense, an argument we rejected above. As the discussion of the statute's meaning demonstrates, § 951's concern is with the agent-principal relationship, and it sweeps into its ambit all "acts," so long as they take place on U.S. soil and at the direction or control of the foreign government. Although the statute does provide some exceptions, none of the additional acts fall within those exceptions.

Nor did the superseding indictment impose limits on proof of Ji's actions. It broadly charged Ji with "knowingly act[ing] in the United States as an agent of a foreign government." When the indictment includes restrictive language, those restrictions impose limitations at trial. *Stirone v. United States*, 361 U.S. 212, 218 (1960) ("It follows that when only one

particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened."); *see also United States v. Pigee*, 197 F.3d 879, 887 (7th Cir. 1999) (finding constructive amendment when the indictment only alleged "storing" crack cocaine, but "the trial court's instruction broadened the possible bases [for conviction] … to include manufacturing, distributing, or using"). But when an indictment "simply track[s] the general language of the statute to describe the enterprise," the indictment itself will not restrict the evidence that can be presented at trial, so long as other aspects of the indictment are observed, such as the alleged dates of the offense. *United States v. Leichtnam*, 948 F.2d 370, 377–78 (7th Cir. 1991). No restrictive language in the indictment limits the evidence the government might present to establish the "act" or the nature of the act itself.

For these reasons, any amplification of evidence at trial beyond what was included in the indictment did not constitute an impermissible constructive amendment to the indictment.

**C. Legal Commercial Transaction**

Ji's second set of challenges shifts our focus to the legal commercial transaction exception in § 951(d)(4), which excludes "any person engaged in a legal commercial transaction" from the definition of "agent of a foreign government." The district court found this exception applied to legal commercial *relationships*, not individual actions.

**1. Statutory Analysis**

Ji contends that the "legal commercial transaction" protected by subsection (d)(4) encompasses specific acts, meaning that the exception would exclude from § 951(a)'s registration requirement *any* legitimate commercial activity taken on U.S. soil—even if at the direction of a foreign government or official.

We examine the meaning of § 951(d)(4) de novo. *See United States v. Stands Alone*, 11 F.4th 532, 534 (7th Cir. 2021). Whether the exception carves out discrete legal acts or only applies when the agent-principal relationship itself constitutes a legal commercial transaction is, first and foremost, a textual question. *See Bostock*, 590 U.S. at 674–75 (warning against "extratextual considerations" when the meaning of the text is "plain"). "[T]he specific context in which that language is used, and the broader context of the statute as a whole" have a role to play when the meaning of a statutory term is in doubt. *See Yates v. United States*, 574 U.S. 528, 537 (2015). Applying these principles and examining the statutory text and structure, we conclude that the exception applies to legal commercial relationships, not discrete acts.

The verbs in § 951(d) indicate that the exception is concerned with an ongoing course of action—i.e., a relationship—rather than discrete, individual acts. Registration is required if a person has "agree[d] to operate," and that requirement disappears if that person is "engaged in" a commercial transaction. § 951(d), (d)(4). In other words, if a person in the United States is engaged in espionage for a foreign government or official, that person must register, even if his actions on behalf of that country are otherwise legal. To conclude otherwise would lead to absurd results, including allowing

foreign agents to avoid the registration requirement by limiting their actions to those not otherwise prohibited under U.S. law. Such a loophole threatens to swallow the statute whole.

The exception's statutory context supports the use of "transaction" as a relationship, rather than an individual act. The other three exceptions in § 951(d) identify categories of individuals who do not need to register, based on their relationship with the foreign government for which the U.S. government already has notice: diplomatic and consular officials, publicly acknowledged representatives, and publicly acknowledged employees of the first two. Each of the first three exceptions focuses on individuals and relationships. It follows that the fourth exception similarly concerns a category of person and relationship with a foreign government, not the nature of a particular act.

A look at the statute as a whole fortifies this conclusion. As explained in Part II.A, § 951 captures all acts, legal or illegal, taken by an agent of a foreign government. This overarching purpose overcomes any superficial appearance that the phrase "legal commercial transaction," read in a vacuum, references individual acts. It would make little sense, absent some clear indication otherwise, to negate the breadth of the statute by narrowing it to capture only those acts that are already illegal.

That *every* agent of certain foreign governments must register with the Attorney General even if that agent is engaged in a legal commercial transaction does not undermine this

conclusion. *See id.* § 951(e).[2] An attorney representing the legitimate interests of a state-owned Chinese company in the United States need not register. But if that attorney is also engaged in espionage, registration is mandatory. On the flipside, because Cuba is listed in § 951(e), any attorney representing Cuban interests in the United States must register. We need not adopt an act-specific interpretation of § 951(d)(4) to give § 951(e) meaning.

What little courts have said about § 951 matches our reading of the plain text. In *Latchin*, the court was unconcerned with whether the actions taken on behalf of a foreign government were legal or illegal; that the agent acted was what mattered. *See Latchin*, 554 F.3d at 715. *United States v. Dumeisi* also bolsters this conclusion. There, we rejected the defendant's argument that "the evidence at trial established nothing more than that he gathered publicly accessible information, published news articles, and communicated with foreign consular officials," none of which were illegal. 424 F.3d 566, 581 (7th Cir. 2005). What mattered, we explained, was not that these acts were technically legal, but whether there was "evidence that Dumeisi acted knowingly at the behest of the [Iraqi Intelligence Service]." *Id.* We also clarified in that case that while the defendant could not be convicted solely for taking a legal and constitutionally protected action (engaging in First Amendment protected speech by publishing an article), he could be held liable for doing so "at the behest" of a foreign

[2] Subsection (e) states, "Notwithstanding paragraph (d)(4), any person engaged in a legal commercial transaction shall be considered to be an agent of a foreign government for purposes of this section if" that person is a foreign agent (1) acting on behalf of certain countries (including Cuba), or (2) who has been convicted of certain enumerated offenses.

government without first registering with the Attorney General. *Id.* at 579.

Decisions by our sister circuits mirror this concern with the relationship, not the particular act. *See Duran*, 596 F.3d at 1295 ("The broad sweep of § 951 creates a plethora of possibilities under which those engaged in purportedly legal conduct on behalf of a foreign government could be convicted if an agent of a foreign government fails to notify the Attorney General of such conduct."). Finally, this interpretation is consistent with the Fourth Circuit's decision in *Rafiekian*, which found that even legal activities such as lobbying and authoring an op-ed, when done at the direction of a foreign government or official, require registration. *See* 991 F.3d at 544.

Though this interpretation of the legal commercial transaction exception relies exclusively on the text of the statute, the legislative history further buttresses our reading. The U.S. Senate Judiciary Committee report on S.1762, the 1984 bill adding subsection (d)(4) to § 951, emphasizes a focus on "classes of individuals" in whom the U.S. government has an interest. S. Rep. No. 98-225, at 415 (1983) ("The proposed Act is not intended to cover those individuals engaged in routine commercial matters but is intended to cover individuals who represent foreign governments in political activities that may or may not come within the scope of the Foreign Agent Registration Act. By excluding from the notification requirement several classes of individuals who are presently covered, the proposal also limits the coverage of the statute by focusing only on those in whom the United States Government has a necessary interest."); *see also Rafiekian*, 991 F.3d at 543 & n.18. Earlier debates about the added exceptions also indicate that Congress was concerned with individuals with particular

relationships to foreign governments (at that time, Soviet, KGB, and GRU agents), regardless of the legality of their actions or the nature of the information sought. Communist Bloc Intelligence Gathering Activities on Capitol Hill, Senate Subcommittee on Security and Terrorism, Committee on the Judiciary, 97th Congress, at 1–4 (May 12, 1982).

The legislative history indicates that Congress sought to exclude those with legitimate business relationships from the registration requirement, such as "American attorneys who represent foreign governments in American courts and individuals involved in legitimate business activities on behalf of a foreign client." *See id.* at 27–28 (statement of Jeffrey H. Smith, State Department). Again, the concern leading up to the addition of subsection (d)(4) to § 951 was not about discrete acts, but about classes of individuals, defined by the nature of their relationship with the foreign government. Espionage, even when conducted through otherwise technically legal activities, falls outside this exception.

**2. Element or Affirmative Defense**

Against this statutory backdrop, we consider Ji's argument that the government is responsible for proving the inapplicability of subsection (d)(4)'s legal commercial transaction exception in his case. As he would have it, the absence of the exception is an element which the government must prove, not (as the district court held) an affirmative defense which he himself must establish.

The Supreme Court's "settled rule" that an indictment need not rule out an "exception made by a proviso or other distinct clause" guides our conclusion here. *McKelvey v. United States*, 260 U.S. 353, 357 (1922); *see also Meacham v.*

*Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008). Instead, the person seeking to invoke such an exception has the burden of establishing its applicability. *United States v. Kelly*, 500 F.2d 72, 74 (7th Cir. 1974) ("[I]f a defendant comes within 'an exception made by a proviso or other distinct clause,' he must set it up and establish it as a defense.") (quoting *McKelvey*, 260 U.S. at 357); *see also United States v. Dickson*, 40 U.S. 141, 165 (1841) ("In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception, must establish it as being within the words as well as within the reasons thereof."). In other words, an express exception set out in a distinct clause is an affirmative defense, not an element of the offense. "That longstanding convention is part of the backdrop against which the Congress writes laws, and we respect it unless we have compelling reasons to think that Congress meant to put the burden of persuasion on the other side." *Meacham*, 554 U.S. at 91–92.

Section 951 fits within this general rule. Section 951(a) explains the offense—failing to register when acting as an agent of a foreign government in the United States. In a distinct subpart, § 951(d), the statute lists four exceptions, the last of which addresses legal commercial transactions. Though Ji only argues that the government must prove the negative of the legal commercial transaction exception in subsection (d)(4), the structure of the statute leaves little room simply to carve out the last exception. If the government has the burden for one, it has the burden for all. Yet no court has ever held that the government has the burden of proving the absence of any of § 951(d)'s exceptions. Without any indication that Congress intended otherwise, we conclude that those exceptions are affirmative defenses available to the defendant to raise,

and the government has no obligation to rule them out. *Accord Rafiekian*, 991 F.3d at 541–43.

Furthermore, we have explained that "[a]n affirmative defense goes beyond the elements of the offense to prove facts which somehow remove the defendant from the statutory threat of criminal liability." *United States v. Petty*, 132 F.3d 373, 378 (7th Cir. 1997). This obligation does not require that the defendant "disprove the elements of the offense." *Id.* Instead, the exception, as an affirmative defense, "lifts the defendant out of the statute." *Id.* In carrying his burden of persuasion on the affirmative defense, Ji need not *disprove* any element of the offense. Someone who falls within subsection (d)(4)'s exception, as with the other exceptions contained in § 951(d), is in fact acting as an agent of a foreign government within the United States. It is the *nature* of that agency relationship that "lifts the defendant out of the statute."

Requiring the government to prove the negative of this exception—that the relationship was not a legal commercial transaction—would be onerous. *See Petty*, 132 F.3d at 378. It would require the government to produce evidence more likely to be in the control of the defendant than the prosecution. *See United States v. Foster*, 652 F.3d 776, 791 (7th Cir. 2011); *see also Rafiekian*, 991 F.3d at 544 (explaining that placing the burden of disproving the exception on the government would be "at odds with § 951's broad, overarching purpose") (citing *Duran*, 596 F.3d at 1294–95). Contrary to Ji's contention that the alleged commercial transaction adds no additional factual considerations, the exception does require going beyond the element that the defendant acted as a foreign agent. The defendant is more likely to have documentation accurately describing the nature of the relationship with the foreign

government or official. Indeed, if that relationship is a legal commercial transaction, it is even *more* likely that such documentation exists. Ji's contention that no additional evidence is necessary to establish the legality of the specific act rests on the assumption that subsection (d)(4) excludes specific *acts*, not agent-principal relationships, an interpretation we rejected above.[3]

**3. Exclusion of Defense from Trial**

Having concluded that § 951(d)(4) excludes from the registration requirements a relationship between the agent and the foreign government or official that is a "legal commercial transaction," we further hold that the district court did not err by preventing Ji from presenting this defense to the jury.

"A court may preclude an affirmative defense by motion in limine if 'the court accepts as true the evidence proffered by the defendant' and finds that the evidence, 'even if believed, would be insufficient as a matter of law to support the affirmative defense.'" *United States v. Sorensen*, 73 F.4th 488, 491 (7th Cir. 2023) (quoting *United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006)). "To be entitled to present an affirmative defense to the jury, a defendant must present 'more than a scintilla of evidence' demonstrating that he can satisfy each

[3] Ji also argues that the rule of lenity compels a decision in his favor because the statute is ambiguous. The rule of lenity "applies only when a criminal statute contains 'grievous ambiguity or uncertainty,' and 'only if, after seizing everything from which aid can be derived,' the Court 'can make no more than a guess as to what Congress intended.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998)); *see also United States v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016). We find no "grievous ambiguity" here and therefore decline to apply the rule of lenity.

element of the proposed defense." *Id.* (quoting *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002)). We review de novo whether the defendant put forward legally sufficient evidence to support the defense, *id.*, and conclude that the district court properly excluded Ji's legal commercial transaction defense.

Ji cannot reasonably argue that his purchase and transmission of background reports falls within § 951(d)(4)'s exception. He presents no argument that his relationship with the MSS was a strictly legal commercial one. Even his purchase of background reports, though technically legal, was an action taken on behalf of the MSS for purposes of espionage. Any argument he could have made to the jury would thus have been legally insufficient to support the affirmative defense.

**III. Evidentiary Challenges**

Ji challenges two rulings by the district court related to incriminating statements he made to the undercover FBI agent posing as an MSS agent: the denial of his motion to suppress those statements without holding an evidentiary hearing, and the exclusion of expert testimony Ji planned to present to contextualize those statements. We reject both arguments.

**A. Motion to Suppress**

"Any criminal trial use against a defendant of his involuntary statement is a denial of due process of law." *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (cleaned up). Before trial, Ji moved to suppress statements he made to the FBI agent posing as an MSS agent, arguing that those statements were involuntary—and therefore inadmissible—because no Chinese person could reasonably refuse to speak to or cooperate with an MSS agent. The district court denied that motion without

holding an evidentiary hearing. Ji now argues that the district court's failure to hold a hearing was reversible error.

When reviewing a district court's denial of an evidentiary hearing on a motion to suppress, we review legal questions de novo and factual findings for clear error. *United States v. Olson*, 41 F.4th 792, 798 (7th Cir. 2022). We review the denial of an evidentiary hearing for abuse of discretion, reversing "only where no reasonable person would agree with the decision made by the trial court." *United States v. Black*, --- F.4th ----, 2024 WL 3058266, at *3 (7th Cir. June 20, 2024).

The Supreme Court instructs that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). We have interpreted *Connelly* to mean that a statement is voluntary unless it is the "result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will." *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000) (quoting *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997)). "Absent a showing of some type of official coercion … a defendant's personal characteristics alone are insufficient to render a confession involuntary." *Id.* (quoting *Watson*, 122 F.3d at 453). For example in *Lawal*, which applied these rules of involuntariness, the defendant moved to suppress statements made to the police after he signed a *Miranda* waiver form because "he [came] from a country where he would have been beaten or tortured if he did not comply with police demands." *Id*. We rejected Lawal's argument because he "fail[ed] to allege any misconduct, abuse, or physical or mental coercion by the

police who questioned him; instead, Lawal buil[t] his entire argument on his unique personal characteristics." *Id.*

These cases establish the baseline necessary to raise a substantial claim of involuntariness: some showing of official coercion by law enforcement, either through psychological intimidation, physical abuse, or deceptive interrogation tactics. The district court correctly noted this requirement and found that Ji failed to present any "disputed issues of material fact which would affect the outcome of the motion." *United States v. Greve*, 490 F.3d 566, 572 (7th Cir. 2007) (cleaned up).

Because the district court properly articulated the law on voluntariness and concluded that Ji had not presented any facts that would create a material dispute as to whether the agent coerced Ji's statement, we then consider whether the district court made any clearly erroneous factual findings. *See Olson*, 41 F.4th at 798.

The following factual findings underpinned the district court's conclusion: Ji appeared composed and eager to provide information, and the undercover FBI agent was neither aggressive nor threatening. Nor did the recordings of Ji's conversations with the agent mention Chinese law or custom that would compel an ordinary Chinese person to cooperate against their will. The district court also found no evidence to support a claim that Ji *subjectively* believed that he must respond to the person he believed was an MSS officer, initial attempts to evade the first meeting aside.[4] Instead, Ji voluntarily

[4] Ji argues that the district court erred by ignoring his offer of proof that he was "terrified" when first approached by the agent. But even if Ji could have proven such a thing, his fear alone does not raise a material issue of fact as to whether the agent coerced him into making statements.

accompanied the agent to a hotel for their interviews on three separate occasions.

In sum, given Ji's age, level of education, and general demeanor while interacting with the agent (including laughter and eagerness to share information), the court did not err in finding the statements were voluntary and denying the motion to suppress.

**B. Clarke Testimony**

After the district court's decision not to exclude Ji's statements to the undercover FBI agent, the government moved to exclude testimony from Professor Donald Clarke. Ji intended to call Clarke as an expert witness to testify regarding the control the Chinese state has over its citizens. That testimony, he claimed, would assist the jury in weighing Ji's statements to the undercover FBI agent.

The district court explained that it would not admit Clarke's testimony for two independent reasons. First, the testimony did not comply with Federal Rule of Evidence 702(d), which requires that an expert's opinion reflect a reliable application of principles and methods to the particular facts of the case. And second, it would be unduly prejudicial in violation of Rule 403.

Ji only challenges the district court's decision to exclude Clarke's testimony under Rule 702. By failing to challenge the parallel Rule 403 decision, Ji has waived the argument. *See United States v. Cisneros*, 846 F.3d 972, 978–79 (7th Cir. 2017). That is a problem for Ji because it means we need not consider whether the district court erred by excluding Clarke under Rule 702. Even if that decision was wrong, the exclusion of Clarke's testimony would still stand under Rule 403.

Even if Ji *had* challenged the district court's ruling on Rule 403 grounds, that decision was not an abuse of discretion. *See United States v. Johnson*, 89 F.4th 997, 999 (7th Cir. 2024). The district court held that Clarke's testimony would be unduly prejudicial because it suggested a coercion defense which Ji never raised. It would also be an unfair substitute for Ji's own testimony, which he declined to give, by allowing an expert to opine indirectly on Ji's state of mind. Neither of these reasons constitutes an abuse of discretion, so the district court did not err by excluding Clarke's testimony.[5]

## IV. Sentencing Challenges

At sentencing, both Ji and the government agreed that no Sentencing Guideline applied to the charges for which the jury found Ji guilty, concluding that the court should instead apply the factors in 18 U.S.C. § 3553(a) to determine an appropriate sentence. The 96-month sentence the district court ultimately imposed exceeded the 63-month recommendation from the government and Ji's request for time served, which amounted to about 52 months. Ji challenges both the substantive and procedural reasonableness of his sentence.

Our analysis proceeds in two steps. "We first evaluate the sentence de novo for procedural error." *United States v. Jerry*, 55 F.4th 1124, 1130 (7th Cir. 2022). Then, "[i]f there is no procedural error, we next review the sentence for substantive reasonableness … remanding for resentencing only if we find an

[5] In the alternative, Ji states that the district court erred by not instructing the jury as to relevant provisions of Chinese law. This argument is undeveloped and unsupported, so Ji has waived it. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

abuse of discretion." *Id.* Because the district court did not err procedurally or substantively, we affirm Ji's sentence.

**A. Procedural Reasonableness**

Ji argues that his sentence was procedurally unreasonable for three reasons: (1) the district court failed to address mitigation arguments; (2) the district court failed to consider sentencing disparities under § 3553(a)(6); and (3) the district court improperly ignored a comparable guideline.

**1. Mitigation Arguments**

As to Ji's mitigation arguments, remand for resentencing "may be required when the district court's discussion of a principal mitigation argument is 'so cursory that we are unable to discern the court's reasons for rejecting the argument.'" *United States v. Stephens*, 986 F.3d 1004, 1009 (7th Cir. 2021) (quoting *United States v. Vidal*, 705 F.3d 742, 744 (7th Cir. 2013)); *see also United States v. Donelli*, 747 F.3d 936, 937 (7th Cir. 2014) ("Since our decision in *United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005), we have required sentencing judges to address a defendant's principal arguments in mitigation when those arguments have recognized legal merit."). The key question here is whether the district court responded to all meritorious arguments, not whether the court of appeals would have weighed those arguments differently. *See United States v. Hatch*, 909 F.3d 872, 875 (7th Cir. 2018).

The district court sufficiently addressed each legally meritorious mitigation argument presented by Ji at sentencing. As to Ji's suicidality while awaiting trial and sentencing, the district court noted the absence of any documented history of mental illness. The district court also addressed possible deportation consequences. It observed that upon removal, his

fellow Chinese citizens and the government would likely not view him as a criminal. The district court also acknowledged that because he would be deported, Ji is unlikely to reoffend. Nevertheless, an interest in general deterrence remained a factor in sentencing.

Nor did the district court impermissibly ignore Ji's mitigation argument that he was mere "cannon fodder," a lowly operative who gave up some opportunities to gain valuable information when he declined opportunities with Motorola and Qualcomm. The district court did acknowledge that "Ji was one such person"—a "seemingly innocent person[] … not likely to be known or arouse suspicion and used for that very reason by the MSS." But it also discussed at length the steps Ji *did* take, and the forethought and initiative he exhibited, to establish himself as a lifelong sleeper agent on behalf of the MSS. The district court was not obligated to give these mitigation arguments more attention than it did. *See United States v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018) ("A district judge must address the defendant's principal arguments made in mitigation, but the explanation can be implicit or imprecise and does not need to be extensive.").

Finally, the district court noted Ji's mitigation argument that he experienced racism while awaiting trial and sentencing. That was more than enough because Ji presented no support for this assertion, and the court need not address baseless mitigation arguments. *See United States v. Jackson*, 547 F.3d 786, 795 (7th Cir. 2008). Similarly, Ji did not put forward any evidence of conditions of detention prior to trial and sentencing. Moreover, the Seventh Circuit has never held that harsh pretrial conditions of confinement justify sentence mitigation.

*See United States v. Daoud*, 980 F.3d 581, 595 (7th Cir. 2020). The district court did not procedurally err.

**2. Sentencing Disparities**

Ji argues that the district court procedurally erred by failing to consider sentencing disparities as 18 U.S.C. § 3553(a)(6) requires.[6] But the district court did consider potential disparities, concluding that each case presented by the defense "is unique." It listed "a combination of key factors," including whether the defendant cooperated or pleaded guilty, the extent of the defendant's involvement in espionage, and the extent to which the sentencing court considered the need for specific and general deterrence. The factors in this particular case, the district court explained, counseled in favor of a longer sentence, including Ji's apparent commitment to embedding himself as a permanent sleeper agent. That explanation is enough.

**3. Comparable Guideline**

Although the parties agreed that no guideline precisely fit Ji's offense, Ji nevertheless argued that U.S.S.G. § 2M3.3 should define the upper limits of his sentence. This is so, he contends, because that guideline provides an advisory range for the actual transmission of intelligence, an offense he considers more serious than the charges he faced. The district court disagreed, and Ji now argues that it was procedural error to inadequately respond to this argument.

---

[6] That a sentence results in wrongful sentencing disparity is a question of substantive reasonableness. *See United States v. Ballard*, 12 F.4th 734, 744–45 (7th Cir. 2021). But Ji only argues the procedural reasonableness of the district court's treatment of his argument.

The district court acknowledged the discretionary nature of Ji's sentence relative to the Guidelines, and Ji cites no legal support for his argument that offenses subject to § 2M3.3 are objectively more serious than his offense. Without a compelling legal argument for why § 2M3.3 should bear on his sentence, the district court was not obliged to contemplate the argument further.

### B. Substantive Reasonableness

Ji's sentence is also substantively reasonable. District courts enjoy wide discretion in sentencing, and "[w]e uphold a sentence so long as the judge offers an adequate statement of his reasons consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Porraz*, 943 F.3d 1099, 1104 (7th Cir. 2019).

Ji claims that because the district court ultimately handed down a longer sentence than either party asked for, and because it failed to explain his 96-month sentence down to the precise month, his sentence is unreasonable. Nothing in our caselaw, however, prohibits a sentencing judge from deviating from both parties' recommendations. Nor is the judge required to give a month-by-month explanation for the sentence meted out. Neither of these alleged errors rendered Ji's sentence substantively unreasonable.

## V. Conclusion

For these reasons, we AFFIRM Ji's conviction and sentence.

KIRSCH, *Circuit Judge*, concurring. I join the opinion but write separately to caution against the use of legislative history to discern legislative intent. The majority rejects Ji's argument that the legislative history supports his interpretation of 18 U.S.C. § 951. Specifically, Ji argues that the legislative history indicates what Congress intended, which "assumes that what we are looking or is the intent of the legislature rather than the meaning of the statutory text." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 375 (2012). But we do not "divine legislative purpose from anything but the words that wound up in the statute." *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1200 (7th Cir. 2023).

I would not have engaged with Ji's argument by pointing to legislative history, which is too malleable to be a reliable tool for deciphering legislative purpose. Instead, I would have rejected his reliance on legislative history as irrelevant. The words of § 951 are enough to determine its meaning.